IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| PAUL WILLARD WOODY, | * | |
| Petitioner, | * | |
| v. | * | Civil Action No. GLR-22-2308 |
| RONALD S. WEBER, et al., | * | |
| Respondents. | * | |
| | * | |

\*\*\*

## MEMORANDUM OPINION

On September 12, 2022, Paul Willard Woody filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (ECF No. 1). Respondents filed an Answer to the Petition on December 28, 2022 asserting that Woody's petition is untimely. (Answer at 17–20, ECF No. 10).[1] On April 4, 2023, the Court directed Woody to file a response to the Respondents' timeliness defense within twenty-eight days. (Apr. 4, 2023 Order at 3–4, 6, ECF No. 14). Woody failed to file a response, but he has asserted his actual innocence. (Pet. at 2, ECF No. 1). The Petition is ripe for disposition, and no hearing is necessary. See Rule 8(a), Rules Governing § 2254 Cases in the U.S. Dist. Cts.; Local Rule 105.6 (D.Md. 2023); see also Fisher v. Lee, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)). For the reasons that follow, the Petition shall be dismissed as time-barred, and a certificate of appealability shall not issue.

---

[1] Citations to the page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

I. **Background**

On August 22, 2008, Woody was indicted on twenty-seven counts related to the sexual abuse of his step-daughter. (Supp. State R. at 6–7, 135, ECF No. 11-5). On March 10 through March 11, 2009, Woody was tried by bench in the Circuit Court for Anne Arundel County, Maryland. (Mar. 10, 2009 Tr., ECF No. 11-1; Mar. 11, 2009 Tr., ECF No. 11-2). The State entered a nolle prosequi on thirteen counts, and Woody was acquitted of nine others. (Mar. 11, 2009 Tr. at 73-81). Woody was found guilty of sexual abuse of a minor, sexual abuse of a minor-continuing course of conduct, sodomy, unnatural or perverted sexual practice, and second-degree assault. (Id.). On May 1, 2009, the Circuit Court sentenced Woody to thirty years imprisonment. (Sentencing Tr. at 31, ECF No. 11-3). Shortly thereafter, on August 26, 2009, Woody filed a letter request for modification of his sentence. (Supp. State R. at 162). Referencing the letter, the Circuit Court noted in a docket entry on September 21, 2009, "no further action is needed." (Id.).

Woody filed a direct appeal with the Appellate Court of Maryland,[2] and in an unpublished opinion issued on February 9, 2011, Woody's conviction was affirmed. (Supp. State R. at 134–149). The mandate issued on March 11, 2011. (Id. at 150). Woody's petition for a writ of certiorari was denied by the Supreme Court of Maryland on May 23, 2011. (Id. at 151–160).

---

[2] At the time Woody's case was litigated in the Maryland state courts, the Appellate Court of Maryland was named the "Court of Special Appeals," and the Supreme Court of Maryland was named the "Court of Appeals of Maryland." At the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of both courts. The name change took effect on December 14, 2022.

Approximately eight years later, on April 30, 2019, Woody filed a petition for post-conviction relief. (Id. at 161–180, 183–87, 202–08). The Circuit Court held a hearing on May 17, 2021. (Post Conviction Tr., ECF No. 11-4). On July 21, 2021, the Circuit Court issued a memorandum opinion denying the petition. (Supp. State R. at 210–19). Woody filed an application for leave to appeal to the Appellate Court of Maryland, which was denied on December 16, 2021. (Id. at 220–26). The Supreme Court of Maryland subsequently denied Woody's petition for a writ of certiorari. (Id. at 227, 229–32).

Woody filed his Petition for Writ of Habeas Corpus in this Court on August 8, 2022. (ECF No. 1).[3] He alleges that (1) he does not have herpes, type "II," which the Court construes as a claim for actual innocence; (2) ineffective assistance of counsel for failing to obtain a DNA test, failing to obtain proof of penetration, and failing to obtain DNA evidence; (3) ineffective assistance of counsel for failing to cross-examine witnesses; and (4) ineffective assistance of counsel for failing to cross-examine the State's medical expert about whether he had herpes. (Id. at 5).

## II.     Standard of Review

The one-year limitation period for a person in state custody to file a federal habeas petition runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws

---

[3] This reflects the date of Woody's signature.

>(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
>(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). Any "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

The limitations period is "subject to equitable tolling in 'those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation against the party.'" Hill v. Braxton, 277 F.3d 701, 704 (4th Cir. 2002) (quoting Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000)); see also United States v. Herrera-Pagoada, 14 F.4th 311, 318 (4th Cir. 2021).

To equitably toll the limitations period, the petitioner must demonstrate "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Herrera-Pagoada, 14 F.4th at 318 (quoting Holland v. Florida, 560 U.S. 631, 649 (2010)). The circumstances could involve "some kind of wrongful conduct on the part of the [respondents]" or other "extraordinary circumstances beyond [the petitioner's] control." Harris, 209 F.3d at 330 (quoting Alvarez-Machain v. United States, 107 F.3d 696, 700 (9th Cir. 1996)). Stated differently, the limitations period

4

may be tolled only in "those rare instances where . . . it would be unconscionable to enforce [it] against the party and gross injustice would result." Id.

### III. Analysis

#### A. Timeliness

In this case, the one-year limitations period for filing for federal habeas relief runs from the date on which the judgment became final by the expiration of the time for seeking direct review. 28 U.S.C. § 2244(d)(1)(A). Woody unsuccessfully appealed his conviction through the Maryland state courts. He had ninety days from May 23, 2011 to seek certiorari with the United States Supreme Court, which he did not do. See U.S.S.C. Rule 13.1. Therefore, Woody's conviction became final on August 22, 2011.[4]

Woody's motion for modification of sentence, filed on August 26, 2009, tolled the statute of limitations. See Mitchell v. Green, 922 F.3d 187, 189 (4th. Cir. 2019) (holding that Maryland Rule 4-345, providing for reconsideration of sentence, tolls the one-year statute of limitations in § 2244(d)). Per Maryland Rule 4-345, the statute of limitations only remained tolled for five years, or until August 26, 2014.

More than a year elapsed before Woody filed his petition for postconviction relief on April 30, 2019, which tolled the limitation period. See 28 U.S.C. § 2244(d)(2) ("The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection"). However, because the petition was

---

[4] August 21, 2011, falls on a Sunday.

filed more than a year after the tolling period triggered by his motion for modification of sentence expired on August 26, 2014, any subsequent habeas petition was already untimely.

By the time Woody filed his federal habeas Petition on August 8, 2022, more than a year had passed where he had no state post-conviction or collateral review pending. Woody's federal Petition is thus untimely. Despite being provided with an opportunity to respond, (See Apr. 4, 2023 Order), Woody has not requested equitable tolling. The Court does, however, construe Woody's first ground for relief as an assertion of the actual innocence gateway.

### B. Actual Innocence

Actual innocence is an "equitable exception to [28 U.S.C.] § 2244(d)(1), not an extension of the time statutorily prescribed." McQuiggin v. Perkins, 569 U.S. 383, 392 (2013) (emphasis in original). "[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief." Id. The merits of a petition which is concededly time-barred, may be reached if "new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" Id. at 395 (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)). In the context of an untimely petition, "[u]nexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing." McQuiggin, 569 U.S. at 399. "It would be bizarre to hold that a habeas petitioner who asserts a convincing claim of actual innocence may overcome the statutory time bar § 2244(d)(1)(D) erects, yet simultaneously encounter a court-fashioned diligence barrier to

pursuit of [his] petition." Id. "This rule, or fundamental miscarriage of justice exception, is grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." Id. at 392.

Examples of the type of new evidence that have been found to satisfy the actual innocence gateway standard are: (1) new DNA evidence and expert testimony "call[ing] into question" the "central forensic proof connecting [the petitioner] to the crime," as well as "substantial evidence pointing to a different suspect," House v. Bell, 547 U.S. 518, 554 (2006); (2) "sworn statements of several eyewitnesses that [the petitioner inmate] was not involved in the crime" and affidavits "that cast doubt on whether [the petitioner inmate] could have participated" in the offense, Schlup, 513 U.S. at 331; (3) a third party's consistent and repeated statement that the third party committed the offense, Jones v. McKee, No. 08 CV 4429, 2010 WL 3522947, at *9–10 (N.D.Ill. Sept. 2, 2010); Carriger v. Stewart, 132 F.3d 463, 478–79 (9th Cir. 1997) (finding that the petitioner opened the actual innocence gateway where another person testified under oath that he committed the offense and separately boasted to other individuals that he set-up the petitioner); and (4) documentary evidence indicating that the petitioner was in another country on the day of the offense and five affidavits from individuals stating that the petitioner was outside the country at the precise time of the offense, see Garcia v. Portuondo, 334 F.Supp.2d 446, 452–55 (S.D.N.Y. 2004); see Schlup, 513 U.S. at 324 (providing the Supreme Court's statement that examples of sufficient new reliable evidence for a gateway claim include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence").

Whether a petitioner has satisfied the miscarriage of justice exception requires the reviewing court to consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." House, 547 U.S. at 538 (cleaned up). The new evidence must be evaluated with any other admissible evidence of guilt. Wilson v. Greene, 155 F.3d 396, 404–05 (4th Cir. 1998). To be credible, a claim of actual innocence must be based on new reliable evidence that was not presented at trial. Schlup, 513 U.S. at 324. "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." Id. at 316.

The Supreme Court "caution[ed], however, that tenable actual-innocence gateway pleas are rare: A petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." McQuiggin, 569 U.S. at 386 (cleaned up); House, 547 U.S. at 538; Wilson, 155 F.3d at 404 ("Claims of actual innocence . . . should not be granted casually") (internal citations omitted). To sustain a credible claim of actual innocence, a petitioner must marshal "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup, 513 U.S at 324. "Because such is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Id. The gateway actual innocence standard is "demanding, and permits review only in the 'extraordinary' case." House, 547 U.S. at 538 (quoting Schlup, 513 U.S. at 299);

8

see, e.g., McQuiggin, 569 U.S. at 401 ("We stress once again that the [actual innocence] standard is demanding.").

"At the same time, though, the [actual innocence] standard does not require absolute certainty about the petitioner's guilt or innocence." House, 547 U.S. at 538. "Rather, the petitioner must demonstrate that more likely than not, in light of new and reliable evidence, no reasonable juror would find him guilty beyond a reasonable doubt." Teleguz v. Zook, 806 F.3d 803, 809 (4th Cir. 2015) (cleaned up). The actual innocence determination "requires a holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard." House, 547 U.S. at 539 (cleaned up); Finch v. McKoy, 914 F.3d 292, 299 (4th Cir. 2019).

In reviewing the record, the Court must "make a probabilistic determination about what reasonable, properly instructed jurors would do." Schlup, 513 U.S. at 299. "The Court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." House, 547 U.S. at 538. The petitioner must "demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a miscarriage of justice. Teleguz v. Pearson, 689 F.3d 322, 329 (4th Cir. 2012). Only if petitioner passes through the actual innocence gateway by satisfying this standard, can this Court consider and reach the merits of his claims. Id.

The Appellate Court of Maryland described the facts adduced at trial as follows:

> [Woody] was tried for having unlawful sexual contact with his step-daughter, "V." between January 1, 2006, when she was eight years old and August 15, 2008, when she was ten. At the

9

time of the alleged offenses, V. lived in a house on Glen Burnie with her two younger sisters, her mother, "C.," and [Woody]. At times, V. shared a bedroom with one of her younger sisters in the residence; at other times V. slept in a camper in the backyard.

V., who was eleven years old at the time of trial, testified that the sexual acts took place both in her parents' bedroom and in the camper, when Woody would do "really bad stuff."

During trial, in response to the State's first question regarding what [Woody] would do, the following colloquy ensued:

[V]:   One time he wanted to put his private part in mine, but it slipped

[Q]:   And what happened?

[A]:   And it went into the other hole.

[Q]:   Okay. What is the other hole used for?

[A]:   Pooping.

[Q]:   Okay. And what happened when you said his private part? Do you know another word for that?

[A]:   I don't really like saying it.

[Q]:   Okay is it—can you tell us what he uses his private part to do?

[A]:   Make babies sometimes.

[Q]:   Okay. And when he put his private part—tell us again what happened?

[A]:   He tried to put it in mine.

[Q]:   Okay. Where were you, V., when that happened?

[A]:   In his bedroom.

10

> [Q]: Okay. And can you tell us were you sitting? Were you standing? What were you doing?
>
> [A]: Ummm, I wasn't—I wasn't particularly sure.
>
> [Q]: Okay, okay. Do you remember how it felt?
>
> [A]: It felt strange.
>
> [Q]: Okay. Did it actually go into your other hole?
>
> [A]: No.
>
> [Q]: Okay. What happened to it?
>
> [A]: It would just keep slipping because it was wet.
>
> [Q]: Okay. It was wet? …. Do you know how it got wet?
>
> [A]: Me.

V. described other examples of [Woody's] actions, including how he would perform oral sex on her ("play around with his tongue" on her private part), and how [Woody] had her use her hands and sometimes her mouth to "go up and down" on his private part. V. described how [Woody] would have her touch his private part until he ejaculated, or in her words, "go boom."

When asked how many times she put her mouth on his private part in that bedroom, V.'s response was "too many to count." She estimated that it took place a few times a week.

After V. moved into the outdoor camper to sleep, [Woody] would come out to the camper "every other day sometimes" and sexually assault her. She described some of these incidents with a specificity similar to the passage quoted above.

V. testified that [Woody] taught her how to use her mother's vibrator, which she explained in detail for the court. When asked if she ever got hurt when any of these things happened to her, V., answered "yes" and testified: "When his private parts would slip down it actually went into my butt a little bit

11

and the skin between the two holes, it got tore." V. never told anyone about the pain caused by her step-father.

In August 2008, V. developed sores which hurt when she went to the bathroom. The pain became so severe that it hurt for V. to walk normally, it forced her to spread her legs as she walked, and it made it too painful for her to wear any underwear. As a result [Woody] called V. "Ms. Waddle."

On the afternoon of August 15, 2008, V.'s mother took her to Nighttime Pediatrics, where she was examined by Dr. Elizabeth Brennan. Based on a visual examination, Dr. Brennan diagnosed V. as having genital herpes. Dr. Brennan did not question her as to how she contracted the disease and, instead, contacted the police department and made arrangements for V. to be seen in the emergency room at the University of Maryland Medical Center.

After leaving Nighttime Pediatrics, V., was taken to the Anne Arundel County Police Department where she provided a statement denying that anyone had touched her vagina. V. later testified that she made that statement because she was fearful that the police would take her and her sisters away and she "didn't want that to happen with D.," her two-year-old sister. At the request of Mrs. Woody, V.'s godmother, Janet Wildberger, met them at the police station and then the three of them drove to the hospital. During the ride, V., revealed facts to Ms. Wildberger. Two days later, Ms. Wildberger shared V.'s story with Holly Chapin, a family friend who was close to V.

On August 22, Ms. Chapin went to the Woody house to speak with V.'s mother, and the two spoke in Ms. Chapin's car. The conversation grew heated at times, and they were interrupted by three children. During the conversation, [Woody] came out and asked Ms. Chapin if she was trying to take his kids away. Referring to the fact that he was being accused of something by Social Services, he told Ms. Chapin, "you know me, I could never do this." Mrs. Woody then said something to him, and Woody replied, "oh, she knows."

Following her conversation at the Woody home, Ms. Chapin called the police. As a result of Ms. Chapin's call, V., went

12

with Ms. Wildberger to the police station where she was interviewed for a second time by Detective Erin Skahan of the Anne Arundel County Criminal Investigations, Child Abuse Unit. During the interview, V. revealed that [Woody] had engaged her in sexual acts.

Detective Skahan obtained a search warrant for the Woody residence, which was executed on August 22, 2008. In the house, Detective Skahan found a vibrator sitting on a dresser at the foot of [Woody's] bed. She also obtained a sample of V.'s DNA, which she then had compared to a partial DNA profile found on the vibrator. Sara Chenoweth, a forensic chemist with the Anne Arundel County Police Department, testified that the DNA on the vibrator was consistent with V.'s profile, she would expect to find that DNA profile in only one in 88 billion Caucasian individuals, and that she was able to rule out Mrs. Woody as a source of the DNA on the vibrator.

The State presented additional evidence about the significance of V.'s diagnosis of genital herpes. Dr. Brennan testified that individuals usually experience a primary outbreak of herpes within a period of several weeks following exposure, although she acknowledged that herpes "can lay dormant for a lifetime" and that recurrent can occur throughout an individual's life. Dr. Wendy Lane from the University of Maryland Medical Center, an expert in pediatrics, pediatric sexual abuse, and sexually transmitted diseases, testified that a primary outbreak of genital herpes always takes place from several days to four months from the time of exposure to the virus.

The State's final witness was Eugene Kenney, [Woody's] brother. Mr. Kenney testified that he received a call from his sister on the afternoon of August 28, 2008, as a result of which he called [Woody]. During their telephone conversation, [Woody] told Mr. Kenney that he "needed to go rescue the children." When Mr. Kenney asked why, [Woody] responded that "he had eaten—the forbidden fruit."

Woody testified on his own behalf. He denied engaging in sexual acts with V. Although he admitted telling his brother that he had tasted "forbidden fruit," he explained that he was speaking in the Biblical sense of the tree of knowledge.

> The defense called Simon Toffler as a witness. A former boyfriend of Mrs. Woody, Toffler was serving a 15-year prison sentence for engaging in sexual acts with V. when she was between the ages of three and five. He testified that he had engaged in sexual acts with V., which included oral sex and attempted forms of intercourse, approximately 75 times. Mr. Toffler further testified that he had been tested for sexually transmitted diseases in the Division of Corrections, and that the tests had come back negative.

(Supp. State R. at 136–41). Woody now argues that new evidence[5]—namely results from a herpes test conducted by the Division of Corrections—demonstrates that he is actually innocent. (Pet. at 5). Woody argues that the test result shows he is negative for herpes, type "II," and therefore could not have been the person that sexually abused V. (Id.). Woody offers a laboratory test report, ordered by Dr. Asresahgn Getachew and conducted by BioReference Laboratories as proof of his claim. (Lab Results at 1). The report shows a negative result for herpes, "type 2." (Id.). However, the report shows that Woody tested positive for herpes, "type 1." (Id.).

---

[5] The Court notes that a circuit split exists regarding whether "new evidence" means "newly discovered" or "newly presented." Reeves v. Fayette SCI, 897 F.3d 154, 161–62 (3d Cir. 2018), as amended (July 25, 2018). The Eighth Circuit has held that "evidence is new only if it was not available at trial and could not have been discovered earlier through the exercise of due diligence." Amrine v. Bowersox, 238 F.3d 1023, 1028 (8th Cir. 2001). The Seventh Circuit and Ninth Circuit have held that federal habeas petitioners may demonstrate an actual innocence claim through "newly presented" exculpatory evidence, that is, evidence not presented to the jury at trial. See Gomez v. Jaimet, 350 F.3d 673, 679–80 (7th Cir. 2003); Griffin v. Johnson, 350 F.3d 956, 963 (9th Cir. 2003). Likewise, the Courts of Appeals for the First, Second, and Sixth Circuits have intimated that petitioners may establish actual innocence claims through newly presented evidence. See Riva v. Ficco, 803 F.3d 77, 84 (1st Cir. 2015); Cleveland v. Bradshaw, 693 F.3d 626, 633 (6th Cir. 2012); Rivas v. Fischer, 687 F.3d 514, 543, 546–47 (2d Cir. 2012).

Woody cannot meet the actual innocence standard because V.'s doctors testified at trial that V.'s herpes infection could have been the result of herpes, "type 1." (Mar. 10, 2009 Tr. at 86–90). Dr. Elizabeth Brennan saw V. when her mother brought her to Nighttime Pediatrics on August 15, 2008. (Id. at 84). Dr. Brennan diagnosed V. with herpes based on the large number of blisters in her genital area. (Id. at 86). Dr. Brennan testified that there are two strains of herpes—type 1 and type 2. (Id. at 89–90). Dr. Brennan testified that type 1 usually causes oral cold sores, but it can cause genital herpes. (Id. at 90). Dr. Wendy Lane, who was qualified as an expert in sexually transmitted diseases, testified that herpes, "type 1" can be transmitted sexually. (Mar. 11, 2009 Tr. at 24). Dr. Lane testified that when an adult who has "type 1" in the mouth performs oral sex it can be transmitted to the genital area. (Id. at 24–25).

This testimony from Woody's trial, coupled with V.'s testimony that he performed oral sex on her (Mar. 10, 2009 Tr. at 36, 40), establishes that Woody's herpes, "type 1" infection could have caused V.'s genital herpes infection. For this reason, a negative test result for herpes "type 2" would not have caused reasonable jurors to find him not guilty.

In any event, the trial record reveals that Woody was not convicted on V.'s herpes diagnosis alone. The trial judge found V.'s detailed testimony about the abuse to be credible based on her emotional response and the believable way she responded to questions. (Id. at 73–74). The trial judge also found Woody's statement that he "tasted the forbidden fruit" to be inculpatory because it generally means engaging in a prohibited act. (Id. at 78–79). The trial judge rejected Woody's defense that V.'s herpes infection was caused by V.'s previous abuser, Mr. Toffler, because the doctors testified she had been

15

exposed shortly before it appeared, and because Mr. Toffler had no sexually transmitted disease. (Id. at 75–78).

In sum, Woody cannot meet the standard for the actual innocence gateway because he has failed to produce new reliable evidence that would have caused no reasonable juror to find him guilty beyond a reasonable doubt. His federal habeas Petition is therefore untimely and no exception to the timeliness requirement applies.

Woody also appears to contend in his first ground for relief that he is entitled to substantive habeas relief because he is actually innocent. However, the Supreme Court has never held that habeas relief extends to freestanding claims of actual innocence. Herrera v. Collins, 506 U.S. 390, 404-405 (1993). "Courts have consistently emphasized that actual innocence for the purposes of Schlup is a procedural mechanism rather than a substantive claim." Finch, 914 F.3d at 298 (citing Teleguz, 689 F.3d at 327). Ground One cannot form the basis for habeas relief.

## IV.     Certificate of Appealability

Having found that the Petition is untimely, this Court must determine if a certificate of appealability should issue. When a district court dismisses a habeas petition solely on procedural grounds, a certificate of appealability will not issue unless the petitioner can demonstrate both "(1) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right' and (2) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" Rose v. Lee, 252 F.3d 676, 684 (4th Cir. 2001) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). Woody's pleadings fail to demonstrate that a certificate of appealability

should issue. He still may request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. See Lyons v. Lee, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

    A separate order dismissing the Petition as untimely and denying a certificate of appealability follows.

Entered this 29th day of May, 2025.

                                                                            _____/s/_____
                                                                            George L. Russell III
                                                                            Chief United States District Judge